217 P.3d 1220

**A TUMBLING–T RANCHES, an Arizona general partnership; Russell Badley Farms, Inc., an Arizona corporation; Rosemary L. Edwards, individually and as Trustee of the Rosemary L. Edwards Trust; John E. Fornes, Jr. and Shelley Fornes, husband and wife; PJ Farms Limited Partnership, an Arizona limited partnership; J&A Fornes, II, an Arizona general partnership; Delmar John and Jean John, husband and wife dba Del-**

mar John Farms; Gila River Farms, Inc., an Arizona corporation; Roy Pierpoint and Ella Pierpoint, husband and wife; Pierpoint Farms, Inc., an Arizona corporation; and Wood Brothers Farms, an Arizona general partnership, Plaintiffs/Appellants/Cross–Appellees,

v.

**FLOOD CONTROL DISTRICT OF MARICOPA COUNTY, a body politic, Defendant/Appellee/Cross–Appellant.**

No. 1 CA–CV 07–0453.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 8, 2009.

Kinerk, Beal, Schmidt, Dyer & Sethi By Burton J. Kinerk and Angela Poliquin, Haralson Miller Pitt Feldman & McAnally PLC By Stanley G. Feldman, Thomas G. Cotter, and Rebecca A. Reed, Tucson, Law Offices of Reed King By Reed W. King, Phoenix, Attorneys for Plaintiffs/Appellants–Cross Appellees.

Helm & Kyle Ltd. By John D. Helm, Roberta S. Livesay, and Jeffrey Lawrence Hrycko, Julie M. Lemmon, Attorney at Law By Julie M. Lemmon, Tempe, Swenson Storer Andrews Frazelle & Sayre PC By Michael J. Frazelle, Phoenix, Attorneys for Defendant/Appellee–Cross Appellant.

## OPINION

BROWN, Judge.

¶ 1 Plaintiffs ("the Farmers") appeal the trial court's denial of their motions for judgment as a matter of law ("JMOL") relating to their unsuccessful inverse eminent domain claim against the Flood Control District of Maricopa County ("the District"). On cross-appeal, the District challenges the negligence claim the Farmers successfully asserted against it. The District argues the Farmers did not establish the standard of care, a breach of that standard, or causation; and that the trial court's damages instruction relating to diminished land values was erroneous. The District further argues the trial court erred in preventing it from asserting numerous affirmative defenses. For the following reasons, we affirm.

## BACKGROUND[1]

¶ 2 Located between Buckeye and Gila Bend, the Gillespie Dam was built in 1921 to divert water from the Gila River for irrigating farmland. The concrete dam was 1,700

1. We review the facts and inferences therefrom in the light most favorable to upholding the jury verdicts rendered. *See, e.g., Powers v. Taser Int'l., Inc.,* 217 Ariz. 398, 399, n.1, ¶ 4, 174 P.3d 777, 778 n.1 (App.2007).

feet long and 21 feet high. Shortly after its construction, sediment filled the dam's reservoir and formed a large wedge at the dam's face that tapered off four to seven miles upstream. This sediment wedge raised the shallow groundwater table, allowing dense tamarisk (or saltcedar) thickets[2] to carpet the area upstream from the dam.

¶ 3 Heavy rainfalls had previously caused major flooding along the Gila River in 1978, in both March and December, and one of the largest floods on record in 1980, in terms of peak flow. Landowners located within the Gila River floodplain upstream from the Gillespie Dam suffered extensive damage to their properties because the tamarisk thickets reduced the velocity of the river's flow and redirected floodwaters in this area. To alleviate the problem, the District cleared the vegetation in a 1,000–foot wide corridor starting at the Gillespie Dam and ending at 91st Avenue in Phoenix, a total of 35.8 miles. The District completed the clearing project in 1985 and maintained it until 1992. The District also excavated a pilot channel in places where the river's low flows were outside the clearing project. On average, the channel was three feet deep and 50 to 100 feet wide. The channel's construction was intermittent but extended roughly 22.5 miles. The District completed the channel in 1992. By removing vegetation and creating a more direct path for the Gila River, these projects were designed to efficiently move floodwaters downstream. By increasing water velocity in the area, the projects also enabled floodwaters to more readily transport sediment.

¶ 4 The Gila River experienced additional major flooding just one year after the District completed its channel project. On January 9, 1993, peak floodwaters breached the Gillespie Dam. The breach eventually expanded to 200 feet in width, releasing a massive amount of sediment downstream as fast-moving floodwaters cut a trench into the sediment wedge that had accumulated for 70 years.

¶ 5 Although the 1993 flood's peak flow, in terms of magnitude, was roughly equal to the preceding years' floods, its total volume was significantly higher due to record rainfall throughout the first part of that year. The dam's breach and the District's flood control projects contributed to the release of an estimated 34 million cubic yards of sediment into the river. An additional five million cubic yards of sediment was attributed to natural flooding.

¶ 6 The resulting sedimentation clogged the Gila riverbed downstream from the Gillespie Dam. Previously, the riverbed in this area had a depth of five or six feet. After the 1993 flood, the riverbed's depth was reduced to approximately two feet, which sharply reduced the river's water-carrying capacity even during moderate flooding. As a result, floodwaters would now flow in unpredictable and irregular patterns, increasing the risk of flood-related damage to landowners.[3]

¶ 7 In 1995, the Farmers, collectively owning about 9,500 acres of land along a 37–mile stretch of the Gila River located downstream from Gillespie Dam and upstream from Painted Rock Dam, sued the past and current owners of the Gillespie Dam and an engineering firm (collectively "the Dam Owners"), alleging that the dam was poorly constructed, maintained, and operated. The Farmers also sued the District, alleging its flood control project contributed to the dam's failure and, more generally, to downstream sedimentation which damaged their properties and significantly increased the risk of damage from future flooding. The Farmers

---

2. The tamarisk was introduced to the southwest in the 1880s and has expanded significantly along rivers since then. It is known to be reproductively opportunistic, to have high water-use efficiency and deep roots, and be tolerant to drought, flooding, and salinity. *See generally,* J. Stromberg, *Dynamics of Fremont cottonwood* (Populus fremontii) *and saltcedar* (Tamarix chinensis) *populations along the San Pedro River, Arizona,* 40 J. Arid Env'ts 133, 134 (1998) (citing W.L. Graf, *Tamarisk and River-channel manage-*

*ment,* 6 Env't Mgmt. 283–296 (1982) (other citations omitted)).

3. For example, the flow rate for the 1980 flood was 178,000 cubic feet per second ("f3/s"). The 1980 floods caused little or no damage to the Farmers' lands. But after sedimentation had clogged the Gila riverbed, the Farmers suffered flooding, erosion, and sediment invasion during a flood in 1995 that had a flow rate of only 50,000 f3/s.

claimed negligence, strict liability, trespass, and nuisance, and in the case of the District, inverse eminent domain.[4]

¶ 8 In 1997, the District sued the Dam Owners, seeking a judicial declaration that it did not owe an obligation to indemnify or defend the Dam Owners against the Farmers' lawsuit. The Dam Owners had earlier asserted that this obligation arose from an indemnity provision contained in easements the District obtained from the Dam Owners to permit construction of the District's project. The Dam Owners counterclaimed, under negligence and inverse eminent domain theories, alleging the District's projects proximately caused the Gillespie Dam to fail. The trial court consolidated the District's lawsuit with the case previously filed by the Farmers.

¶ 9 The Dam Owners and the District temporarily put aside their differences to jointly move for summary judgment against the Farmers. They argued the Farmers' damages, if any, were caused by the "magnitude and duration" of the 1993 flood and not by the failure of Gillespie Dam. The motion asserted that the sediment trapped behind the dam, once released, was too fine to settle in the Gila riverbed adjacent to the Farmers' lands; instead, it settled when floodwaters were impounded by the Painted Rock Dam. The Farmers countered that they were only required to show that the defendants caused them "some damages." The trial court granted the motion for summary judgment, but this court reversed. *See A Tumbling–T Ranches v. Paloma Inv. Ltd. P'ship*, 197 Ariz. 545, 550–53, ¶¶ 17–22, 5 P.3d 259, 264– 67 (App.2000) (holding (1) a genuine issue of material fact existed as to whether the defendants' actions increased downstream sedimentation and thereby contributed to the Farmers' damages and (2) the Farmers were

not required to show "individualized damages" under the indivisible injury rule).

¶ 10 On remand, the trial was bifurcated into a liability phase and a damages phase. The liability trial started in April 2004 and lasted seven weeks. At that time, the Dam Owners again asserted their claims against the District. They argued the District had aimed "a water cannon" at the Gillespie Dam by constructing its flood control projects, focusing fast-moving floodwaters on a limited portion of the dam, thereby causing it to fail during the 1993 flood. To this, the Farmers added that the "water cannon" was aimed at a negligently designed, maintained, and operated dam. Further, the Farmers advanced their own theory: the District's projects, regardless of the dam's failure, contributed to the massive shift of sediment downstream, which reduced the capacity of the downstream channel and created an increased risk of future flooding.

¶ 11 The liability jury rejected the Dam Owners' claims against the District, finding by way of a general verdict that the clearing and channelization projects did not cause the Gillespie Dam to fail. The jury also rejected the Farmers' inverse eminent domain claim. The jury did, however, return a verdict for the Farmers on their negligence claim, apportioning liability as follows: 80% to the Dam Owners, 10% to the District, and 10% to non-parties at fault. As such, the jury found that the Dam Owners and the District, as joint tortfeasors, caused the Farmers at least some damages unrelated to natural flooding. The court entered a liability judgment in December 2004, but the order was not appealable. The District requested and was denied a new trial.

¶ 12 A twelve-day trial on damages was held in November 2006.[5] The jury awarded the Farmers approximately $5.36 million in damages.[6] In May 2007, the trial court en-

---

4. At trial, the court declined to instruct the jury on strict liability, trespass, and nuisance. The Farmers do not challenge those decisions on appeal.

5. The Dam Owners settled with the Farmers before the damages trial started. *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 220 Ariz. 202, 206, ¶ 6, 204 P.3d 1051, 1055 (App.2008).

6. Damages were awarded as follows: A Tumbling–T Ranches, $1,548,595; Russell Badley Farms, $488,875; Delmar John Farms, $837,466; Rosemary Edwards, $346,913; Wood Brother Farms, $869,205; John and Shelley Fornes, $51,218; PJ Farms Ltd. Partnership, $729,273; Pierpoint Farms, Inc., $419,993; and Gila River Farms, Inc., $66,935, for a total award of $5,358,473.

tered final judgment against the District in the amount of $536,000, based on its percentage of fault. The Farmers filed a timely notice of appeal and the District cross-appealed. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") Section 12–2101(B) (2003).[7]

## DISCUSSION

### I. The Farmers' Appeal

¶ 13 At the close of evidence during the liability trial, the Farmers made an oral motion for judgment as a matter of law on their inverse eminent domain claim.[8] The Farmers argued that they proved the District built a public project that caused them damages by creating an increased risk their lands would be flooded. The trial court denied the motion. Following the jury's verdict, but before the court entered judgment, the Farmers filed a renewed motion for JMOL. Based on the jury's negligence finding, the Farmers asserted they proved the District's flood control projects caused "some" of their damages. The court denied the motion without comment. Two years later, at the end of the damages trial, the Farmers unsuccessfully moved for reconsideration of their prior motions for JMOL, asserting that the previous rulings were manifestly erroneous and unjust and that "new circumstances" had arisen in the interim. According to the Farmers, they had established the elements of an inverse eminent domain claim: (1) the District had undertaken a public improvement and (2) the improvement caused damages to the Farmers. The Farmers re-asserted positions taken in their prior motions and argued further that the jury's verdicts in the damages trial

proved that the District's project significantly diminished the value of their properties. On appeal, the Farmers challenge the trial court's denial of these JMOL motions.

### A. Controlling Law: Inverse Eminent Domain

¶ 14 We review de novo whether a trial court should have granted a motion for JMOL. *Aegis of Ariz., L.L.C. v. Town of Marana*, 206 Ariz. 557, 566, ¶ 34, 81 P.3d 1016, 1025 (App.2003). A motion for JMOL should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In making this determination, we view "the evidence in a light most favorable to upholding the jury verdict" and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998).

¶ 15 The gist of the Farmers' argument regarding their JMOL motions remains unchanged—the District constructed a public improvement and therefore the liability jury only had to decide that the improvement caused them some damages, which was satisfied when the jury found the District ten percent at fault. The Farmers contend a public entity is liable for inverse eminent domain for "any damage" to real property caused by a public improvement.

7. We cite the current version of the applicable statutes if no revisions material to this decision have since occurred.

8. The District argues that the motion for JMOL was defective under Arizona Rule of Civil Procedure 50 because the Farmers did not make their motion in writing and, in any event, it was legally insufficient. We reject these arguments. First, Rule 50(a)(1) permits oral motions for JMOL at trial. *See, e.g., Murcott v. Best Western Int'l, Inc.*, 198 Ariz. 349, 356, ¶ 34, 9 P.3d 1088, 1095 (App.2000); *see also* Ariz. R. Civ. P. 7.1 (oral motions are acceptable at trial or hearing). Second, although a party moving for JMOL must

specify the judgment sought and the law and facts entitling judgment in its favor, technical precision is not required so long as the trial court is sufficiently informed as to the moving party's position. *See La Bonne v. First Nat. Bank of Ariz.*, 75 Ariz. 184, 189–90, 254 P.2d 435, 439 (1953). Here, the Farmers sufficiently apprised the court of their position: they requested a specific judgment, cited two precedential cases, and argued the evidence supported a finding that the District's clearing project caused some damage to the Farmers. Accordingly, the Farmers satisfied the standards of Rule 50(a)(2).

¶ 16 The District counters that damages occurring "incidentally to the construction of a public project do not constitute a constitutional taking or damaging" and that the risk of flooding is not the type of damage compensable under Arizona's Constitution. The District further asserts that the Farmers failed to prove their increased risk of flooding was permanent or that it was likely to recur so as to prevent the Farmers from enjoying their property rights for an extended period. Finally, the District argues, consistent with the Farmers' proposed instruction, that the jury did not find that the District "substantially interfere[d]" with the Farmers' property rights.

¶ 17 In our view, both parties fail to accurately describe current Arizona law regarding a claim for damages based on the theory of inverse eminent domain. This is not particularly surprising, however, given the relatively few reported decisions addressing whether and under what circumstances a person may recover damages from the government based on an increased threat of flooding. Because those decisions fail to definitively establish the level of proof required to show entitlement to damages, we attempt to do so here.

¶ 18 In Arizona, the government must pay just compensation when it takes or damages private property. Ariz. Const. art. 2, § 17 ("No private property shall be taken or damaged for public or private use without just compensation[.]"). If the government has not filed a condemnation action to acquire the private property, the property owner's remedy is to sue for inverse eminent domain to recover the fair market value of the property interest taken or damaged. *See Pima County v. Bilby,* 87 Ariz. 366, 370, 351 P.2d 647, 649 (1960). Unlike a condemnation action, a suit for inverse eminent domain is not governed by statutory requirements. To prevail, a plaintiff must prove a governmental entity constructed or developed a public improvement that substantially interfered with the plaintiff's property right. *Maricopa County Mun. Water Conservation Dist. No. 1 v. Warford,* 69 Ariz. 1, 11, 206 P.2d 1168, 1175 (1949) ("Any substantial interference, therefore with the rights over a physical object which destroys or lessens its value, or by which the use and enjoyment thereof by its owner is in any substantial degree abridged or destroyed, is both in law and in fact a 'taking' of property.") (citation omitted). The only element disputed here is whether the Farmers established, as a matter of law, that the District's flood control projects interfered with Farmers' property rights to the extent such interference should be considered a constitutional taking or damaging of their rights. *See id.*

¶ 19 Contrary to the District's assertion, the increased threat of flooding has been recognized as a harm that is potentially compensable under Arizona's Constitution. *See, e.g., Clausen v. Salt River Valley Water Users' Ass'n,* 59 Ariz. 71, 84–85, 123 P.2d 172, 178 (1942) (finding that if spillway construction "had the effect of lessening the value of the land, it is just as much damaged, to the extent its value is thereby reduced, as it would be if the reduction in value had been caused by the water actually flowing upon it from the spillway"); *Bilby,* 87 Ariz. at 373, 351 P.2d at 651 (recognizing right of action for decrease in value of land after reconstruction of roadway affected natural flow of drainage water). This is true despite case law suggesting that in other contexts a taking or damaging does not occur unless there is a physical invasion of the plaintiff's property. *See, e.g., Rutledge v. State,* 100 Ariz. 174, 178, 412 P.2d 467, 471 (1966) (holding damages incidental to the building of a highway were barred by a two-year statute of limitation and stating there can be no constitutional taking or damaging without a physical invasion).

¶ 20 Generally, the character of the interference determines whether a taking or damaging occurs and not the extent of resulting harm, so long as it is "substantial." *State ex rel. Herman v. Southern Pac. Co.,* 8 Ariz. App. 238, 241–42, 445 P.2d 186, 189–90 (1968). In terms of establishing constitutional damages for an increased threat of flooding, we construe reported case law as imposing a similar requirement. *See Clausen,* 59 Ariz. at 84–85, 123 P.2d at 178 (finding the threat of flooding would be a permanent injury, if a jury determined that the threat is

"*so menacing and dangerous* that it depreciates the value of the [landowner's] property") (emphasis added); *State v. Leeson,* 84 Ariz. 44, 50, 323 P.2d 692, 696–97 (1958) (finding sufficient evidence to support damages based on actual diversion of water onto plaintiff's property and flooding of an "inevitably recurring character"); *City of Yuma v. Lattie,* 117 Ariz. 280, 285, 572 P.2d 108, 113 (App.1977) (recognizing that just compensation be paid by a city, "regardless of the establishment of a road grade line, where the easement of ingress or egress of a property owner is *substantially impaired*") (emphasis added); *see also City of Tucson v. Apache Motors,* 74 Ariz. 98, 106, 245 P.2d 255, 260 (1952) (distinguishing *Clausen* and finding threat of flooding in a nuisance action was a temporary injury); *Bodin v. Stanwood,* 79 Wash.App. 313, 901 P.2d 1065, 1070 (1995) (rejecting claim for increased fear of flooding that was based solely on plaintiff's decreased "enjoyment" of the property).

¶ 21 Thus, we reject the Farmers' assertion that "any" damage to property would be sufficient to justify compensation from the government. Instead, a person seeking recovery of damages under the Arizona Constitution for a reduction in property value based on an increased risk of flooding must prove that such risk has caused a substantial interference with private property rights. Stated differently, the increased threat of flooding must be of sufficient magnitude, *e.g.,* "so menacing and dangerous," *Clausen,* 59 Ariz. at 85, 123 P.2d 172, P.2d at 178, and of sufficient probability, *e.g.,* "strong tendency," *id.,* or of an "inevitably recurring

character," *Leeson,* 84 Ariz. at 50, 323 P.2d at 697, that it depreciates the value of the plaintiff's property. Such a finding is to be made by the trier of fact. *See Clausen,* 59 Ariz. at 86, 123 P.2d at 178 (recognizing that whether the threat of flooding depreciates the value of private property is "clearly [a] question[ ] for the jury, or the judge, if sitting without one, to determine").[9]

## B. Challenge to the Liability Jury's Verdicts

¶ 22 With these principles in mind, we now turn to the Farmers' arguments. Without saying as much, the Farmers challenge the liability jury's verdicts by suggesting the jury's decision not to hold the District liable under inverse eminent domain is inconsistent with the jury's implicit finding that the District negligently caused *some* damage to the Farmers. Thus, the Farmers ask us to reverse the denial of their motions for JMOL and remand to determine the full extent of their damages on their eminent domain claim. In response, the District presents a number of arguments, one of which we find dispositive—the jury could have reasonably determined, based on the instructions it received, that the District did not substantially interfere with the Farmers' property rights.

¶ 23 Where jury verdicts appear inconsistent, we will exhaust all reasonable ways to read them as expressing a coherent view of the case before disregarding them. *See United Dairymen of Ariz. v. Schugg,* 212 Ariz. 133, 138, ¶ 19, 128 P.3d 756, 761 (App. 2006).[10] We find that the jury verdicts from

---

9. Because liability under inverse eminent domain, at least in this context, is so tied to the magnitude and probability of future flooding such that it reduces a property's present value, the bifurcation of such proceedings into separate trials on liability and damages should be made with great caution, if at all. *Cf. City of Tucson v. Transamerica Title Ins. Co. of Ariz.,* 26 Ariz.App. 42, 545 P.2d 1004 (1976) (finding that a simple inverse eminent domain case was unduly complicated by counsel and the trial court, which among other things, bifurcated the trial into a liability and damages phase).

10. We note that in Arizona, as in other jurisdictions, inconsistent verdicts do not *per se* require reversal but may be permissible. *See State v.*

*Zakhar,* 105 Ariz. 31, 32, 459 P.2d 83, 84 (1969) ("in most jurisdictions the rule is that consistency between the verdicts on the several counts of an indictment is unnecessary"); *State v. DiGiulio,* 172 Ariz. 156, 162, 835 P.2d 488, 494 (App. 1992) ("there is no constitutional requirement that verdicts be consistent"); *Eldredge v. Miller,* 78 Ariz. 140, 146–47, 277 P.2d 239, 243 (1954) ("To vitiate two verdicts because of inconsistency, they must necessarily be based on inconsistent findings of fact. The jury not having been told the legal consequences of the two verdicts might well have thought that it could find in favor of defendants Eldredge on the cross-claim, even if it found as a fact that Loren Eldredge's negligence contributed to the damage to the Eldredge car. Hence the result was not necessarily

the liability trial and the damages trial can be reconciled. We base our determination on the distinct language of the damages elements in the negligence and inverse eminent domain jury instructions. The trial judge instructed on negligence as follows:

> [The Farmers] must prove it is more probable than not that:
>
> 1. [the District] was at fault;
>
> 2. [the Farmers] were injured; and,
>
> 3. [the Farmers] *sustained some damages.*

(Emphasis added.) After giving the instruction, the judge stated: "As I told you at the beginning of the case, you're only to determine the fault here and not damages. But you still have to find there were some damages by these people without putting an amount to it." The inverse eminent domain instruction was not so limited. It provided:

> [The Farmers] must establish that a public improvement was undertaken by [the District] and that it caused damages [to] them. A public entity is liable in an inverse eminent domain action for any damage to property proximately caused by a public improvement. For purposes of inverse eminent domain, *the term damage[ ] includes any substantial interference with the rights or use of property that destroys it or lessens it in value.*

(Emphasis added.) The critical difference between the two instructions is the level of proof required to show damages. As to neg-

ligence, the jury was merely required to find "some" damage. By contrast, the inverse eminent domain instruction articulated an additional consideration relating to damages—that the District caused "a substantial interference" with the property rights of the Farmers.[11]

¶ 24 Hence, a reasonable jury as instructed here could have found against the Farmers on their inverse eminent domain claim. *See Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 138, 907 P.2d 506, 524 (App.1995) (applying the assumption that a jury follows the trial court's instructions). Presumably the Farmers presented some evidence of damages relating to the threat of future flooding during the liability trial.[12] But such evidence does not establish as a matter of law that the District's clearing and channelization projects, located miles upstream from the farmland in question, caused a substantial interference with the Farmers' property rights. Instead, the issue of substantial interference was appropriately given to the jury for consideration.

¶ 25 Additionally, as the District correctly notes, the Farmers never objected to the inverse eminent domain instruction.[13] Despite the risk it posed to their claim in hindsight, the Farmers failed to object because the instruction was essentially theirs.[14] Not only did the Farmers propose an instruction that listed the elements of inverse eminent domain,[15] they also proposed a sec-

a finding of inconsistent facts but may well be attributed to a misapplication of the law, concerning which the jury had no knowledge.").

11. The inverse eminent domain instruction did not technically require a finding of substantial interference, as it merely stated that damages *include* that level of harm. Apparently, however, the jury understood the instruction to *require* substantial interference.

12. The Farmers do not cite any portion of the record showing what evidence they presented to prove *some* damages; however, the District does not challenge the jury's implicit finding that the Farmers had proven *some* damages in connection with their negligence claims against the Dam Owners and the District.

13. The District also contends that the Farmers cannot challenge the trial court's denial of their motions for JMOL because they submitted their

inverse eminent domain claim to the jury. We disagree. By failing to object to jury instructions, a party does not concede that the court correctly decided a jury should try the claim. *See United Dairymen,* 212 Ariz. at 137, ¶ 12, 128 P.3d at 760.

14. At oral argument before this court, counsel for the Farmers acknowledged that the "substantial interference" language created an unanticipated risk to the inverse eminent domain claim.

15. The Farmers' first proposed jury instruction provided:

> [The Farmers] and [the Dam Owners] are each asserting claims for inverse eminent domain against [the District] for their respective property damage. To establish their respective inverse condemnation claims, they must establish that a public improvement was undertaken by [the District] and that it caused damage to them.

ond instruction that further defined damages to include any substantial interference with a property right.[16] When the court discussed jury instructions, the Farmers seemed preoccupied with whether the jury would understand that inverse eminent domain does not require fault. Critically, the Farmers did not object when the trial court deleted the portion of their proposed instruction clarifying that the *increased threat of flooding* could constitute a substantial interference with private property. Nor did the Farmers object to bifurcation of the trial such that two separate juries would decide the outcome of their claims.

¶ 26 After the instruction was given, however, the Farmers attempted to refashion it. During closing argument, counsel for the Farmers carefully explained the requirement of finding "some damages" to support the negligence claim. He read a portion of the inverse eminent domain instruction, but did not include the substantial interference language. Instead, he told the jury that if "some damage was caused," it would satisfy the damages element of this claim as well. During rebuttal argument, he added:

> We have a bifurcated case. And the only thing you need to determine, as far as damages ... as far as the inverse eminent domain [issue], that [the Farmers] sustained some damages. Some. That's the issue. That's the law. That's what the law of the case is.

¶ 27 Consistent with the statements made during closing argument, on appeal the Farmers essentially ignore the substantial interference language, instead arguing that *any* infringement of their property rights

satisfied the damages element. As previously noted, *supra*, ¶¶ 18–21, to prevail on a claim for inverse eminent domain based on a threat of future flooding, the law requires a plaintiff to show a substantial interference, in terms of magnitude and probability, so as to reduce the value of a landowner's property. Thus, we reject the Farmers' attempt to lessen the burden of proof to recover damages on a theory of inverse eminent domain.

¶ 28 We also reject the Farmers' contention that the jury's verdict in the damages trial established substantial interference as a matter of law. The Farmers have provided no authority in support of this argument. Moreover, the Farmers did not object to bifurcation of the trial proceedings. They had a full and fair opportunity to present their inverse eminent domain case to the jury in the 2004 liability trial. They simply failed to meet their burden of proving the elements of inverse eminent domain at that stage of the proceedings. The Farmers are bound by their decision to have the case tried to separate juries.

¶ 29 In sum, the Farmers provided the trial court with a jury instruction that was contrary to their position in subsequent proceedings, at both the trial and appellate levels. Based on the "substantial interference" instruction given to the jury, which is consistent with the proper legal standard for proving a claim based on inverse eminent domain, reasonable persons could have concluded that the Farmers failed to meet their burden of proof. Thus, we affirm the court's denial of the Farmers' renewed motion for JMOL.

---

**16.** The Farmers' second proposed jury instruction provided:

A public entity is liable in an inverse eminent domain action for any damage to property proximately caused by a public improvement that was deliberately designed and constructed, whether or not that injury was foreseeable, and whether or not the public entity was at fault. For purposes of inverse eminent domain, the term damaged includes any substantial interference [with] the rights or use of property that destroys it or lessens its value, *including causing an increased threat of future flooding and any direct damages caused by the activity undertaken by [the District].*

(Emphasis added.) The trial court did not read the first sentence of the second instruction to the jury, agreeing with the District that it was unnecessary. The court then deleted the clause following "lessens its value." The deleted clause explained that the increased threat of flooding could constitute a substantial interference with the Farmers' rights. The court made this decision on the belief that the liability jury did not need this information, as it related to damages. Including the omitted language on damages may have been helpful in assisting the jury to understand the increased threat of flooding claim made by the Farmers. But the Farmers failed to object to the court's decision removing the language and cannot now complain of its omission.

## II. The District's Cross–Appeal

¶ 30 On cross-appeal, the District argues the trial court made a number of reversible errors, including: (1) holding it liable for negligence when the Farmers failed to establish a standard of care, a breach of that standard, or legal causation; (2) instructing the jury on diminished land values as a measure of damages; (3) denying its motion for JMOL based on governmental immunity under A.R.S. §§ 12–820.01 (2003) and 26–314 (Supp.2008); (4) failing to instruct the jury on assumption of risk; (5) failing to instruct the jury on assigning fault to the United States Army Corps of Engineers as a non-party and ruling that certain Farmers could recover flood-related damages despite having sold flowage easements to the Corps of Engineers; (6) granting summary judgment on the issue of whether the Farmers' failure to obtain permits for floodplain activities was illegal and therefore barred their claims; and (7) granting summary judgment permitting the Farmers to seek permanent damages for lands located within the confines of a navigable river. We address these contentions in turn.

### A. Negligence

¶ 31 Under the common law, a party who alters the natural flow of water must do so non-negligently. *See, e.g., City of Globe v. Shute*, 22 Ariz. 280, 288, 196 P. 1024, 1027 (1921). The District argues that the Farmers failed to prove all elements of negligence: duty, breach, causation, and damages.

### 1. Standard of Care and Breach

¶ 32 The District acknowledges it owed the Farmers a duty, but contends the Farmers failed to provide expert testimony establishing the relevant standard of care for a flood control district and also failed to present evidence showing how the District fell below that standard. Specifically, the District argues that the Farmers did not show how it negligently designed, constructed, or maintained its flood control projects. Rather, the District contends it used the best available techniques and design tools from the Corps of Engineers to design and evaluate the effects of its projects and the resulting harm to the Farmers, if any, was unforeseeable. The District therefore asserts that the negligence verdict was not supported by substantial evidence.

¶ 33 The District fails to respond, however, to the Farmers' counterargument that it did not raise standard of care and breach as issues at the trial court level. Instead of directing our attention to where it raised and preserved these issues in the record, the District simply responds that the Farmers' claim is "ludicrous."

¶ 34 It is not our responsibility to search the record to determine if the issues raised on appeal were properly preserved. *See* ARCAP 13(a)(6) (requiring an appellant to provide citations to the record); *see also Ramirez v. Health Partners of S. Ariz.*, 193 Ariz. 325, 327, n.2, 972 P.2d 658, 660 n.2 (App.1998) ("judges are not like pigs, hunting for truffles buried in the record") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Requiring parties to accurately cite the record advances judicial economy and is especially important in complex civil cases, such as this one, which has tens of thousands of pages of pleadings, exhibits, and transcripts. Locating applicable exhibits is particularly cumbersome given that hundreds of the trial exhibits, marked but not admitted, were released to the parties and are not in the appellate record. Nonetheless, we have conducted a thorough review of the record. Having done so, we conclude the District did not raise standard of care and breach issues it now seeks to assert on appeal.

¶ 35 First, the District did not sufficiently address these issues in any of its motions in limine immediately prior to the liability trial. The District's motions sought to exclude the testimony of four expert witnesses: (1) Mr. George Cotton because he did not use accurate map intervals in calculating downstream sediment deposits; (2) Daryl Simons, Ph.D., because his computer modeling failed to pass the test for the admissibility of expert testimony under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); (3) Michael Stevens, Ph. D., because his computer model also failed under the *Frye* test; and (4) Robert Simons, Ph.D., because he did not have the expertise

to testify about the dam and its structural soundness. The trial court denied these motions, although the record indicates that only Mr. Cotton and Dr. Stevens testified. Only one motion touched on the standard of care and breach:

> One of Robert Simons' opinions is that [the District] did not render a 'thorough, comprehensive impact study as it concerns the clearing and pilot channel project and the potential impact upon the Gillespie Dam and the property owners downstream from the dam. Robert Simons will conclude that [the District] should have noticed that in the late 1970's or early 1980's, the dam was in a condition bad enough for [the District] not to rely on the Arizona Department of Water Resources when [the District] built the clearing corridor[.] He will then conclude that [the District's] action was unreasonable and below the proper standard of car[e] for engineers.

This motion, however, was directed at preventing testimony regarding the dam's breach and thus is irrelevant to the Farmers' claim that the District's projects directly contributed to downstream sedimentation even without the dam's breach.

¶ 36 Second, the District did not raise issues relating to the standard of care or breach through an oral motion for JMOL when the Farmers concluded the presentation of their case at the liability trial. The District did state: "[W]e want to reurge now, in the form of motions to dismiss, our motions for summary judgment that were made prior to trial." This statement conceivably included every motion for summary judgment the District made between 1995 and 2004. The District has not directed us to, nor has our review of the record revealed, any motion for summary judgment that addressed the standard of care and breach

issues the District now raises on appeal. Without greater specificity, the District's oral motion was insufficient as a matter of law. *See* Ariz. R. Civ. P. 50; *see also La Bonne,* 75 Ariz. at 189–90, 254 P.2d at 439 (although technical precision is not required, the party moving for JMOL must specify the judgment sought and the law and facts entitling judgment in its favor). Nor did the District make any oral motions for JMOL at the close of all evidence relating to the standard of care or breach.[17] Logically, the District could have asserted that the evidence did not support a jury instruction on negligence, but no such objection was made and therefore the District waived its right to contest the sufficiency of the evidence on this issue. *See Dawson v. Withycombe,* 216 Ariz. 84, 99, ¶ 38, n. 10, 163 P.3d 1034, 1049 (App.2007).

¶ 37 Finally, none of the court's minute entries during the liability trial reflect that the District filed any written motion for JMOL relating to the standard of care or breach. Nor does the record establish that these issues were raised in the District's motion for a new trial.

¶ 38 In short, we find the District waived all its arguments relating to the Farmers' alleged lack of proof regarding the standard of care and breach. *See Lansford v. Harris,* 174 Ariz. 413, 419, 850 P.2d 126, 132 (App. 1992) (refusing to consider argument on appeal when this court could not find any instance where argument was made in the trial court).

## 2. Causation

### a. Single Injury Rule

¶ 39 The District argues that the trial court erred by not requiring the Farmers to prove its projects caused each individual Farmer some damages and therefore the

---

17. Here, the parties discussed what issues, if any, remained for the jury to decide:

> COURT: I'm going to deny the trespass. I'm inclined to deny nuisance. The facts of this case don't amount to, quote, nuisance, unquote, or trespass in my view.
> DISTRICT (Barfield): If they're out, we'll take that.
> DISTRICT (Helm): If those claims are out, we don't need the instructions. But we haven't heard that they're out.

> COURT: My thought—I thought the only claims were the fault and the inverse eminent domain. I'll take a look.
> FARMERS (Kinerk): There are claims for inverse eminent domain, strict liability.
> COURT: Strict liability is out, too.
> DISTRICT (Helm): We also move on trespass and nuisance, that they be dismissed.
> . . .
> COURT: Trespass and nuisance are gone.

court incorrectly denied the District's motions for JMOL or a new trial. We disagree.

¶ 40 This court previously addressed the District's argument in *A Tumbling–T Ranches I,* holding that the single injury rule applied to the factual scenario presented here. 197 Ariz. at 551, ¶ 22, 5 P.3d at 265 (citing *Taft v. Ball, Ball & Brosamer Inc.,* 169 Ariz. 173, 177–78, 818 P.2d 158, 162–63 (App.1991); *Markiewicz v. Salt River Valley Water Users' Ass'n,* 118 Ariz. 329, 338–39, 576 P.2d 517, 526–27 (App.1978)). This court interpreted the single injury in this case as the system-wide change to the Gila River caused by the downstream sediment deposits attributable in part to the Dam Owners and the District. *Id.* at 551–52, ¶ 22, 5 P.3d at 265–66. The Farmers had the initial burden of showing the Dam Owners and the District's conduct caused the Farmers some damage beyond natural flooding. *Id.* at 552, ¶ 25, 5 P.3d at 266. But once the Farmers made this showing, the District would then be responsible for apportioning damages between natural flooding, the Dam Owner's negligence, and its own negligence. *Id.* In our view, *A Tumbling–T Ranches I* also resolved the question of whether the Farmers were required to prove how the District caused individual harm to each Farmer.[18] *See id.* at 551, ¶ 22, 5 P.3d at 265 (applying the single injury rule and finding that Farmers were not required to show "individualized damages").

¶ 41 With the benefit of hindsight, we would not interpret the single injury rule in the same manner. The injury-causing event in this case (the increased threat of flooding along a roughly 35–mile stretch of the Gila River) potentially raised separate causation issues for individual Farmers. Neither *Taft* nor *Markiewicz* found that the plaintiffs in those cases were relieved from proving individual causation. To the contrary, one of the issues in *Markiewicz* was whether the trial court erred in denying the plaintiffs' class action status. 118 Ariz. at 340–42, 576 P.2d at 528–30. In affirming the court's order, *Markiewicz* noted that although there were questions of law and fact

common to the plaintiffs, they did not predominate over individual questions, to include proximate cause. *Id.* at 342, 576 P.2d at 530. Unlike the Farmers, the plaintiffs in *Markiewicz* were located relatively close to one another, being situated within several city blocks. *See id.* at 332–33, 576 P.2d at 520–21.

¶ 42 Notwithstanding this concern, this court's decision in *A Tumbling–T Ranches I* reversed the trial court's grant of summary judgment, which was partially based on the Farmers' alleged failure to offer evidence showing how each Farmer was individually affected by the increased threat of flooding. 197 Ariz. at 548–49, ¶ 9, 5 P.3d at 262–63. Thus, our decision in *A Tumbling–T Ranches I* constitutes the law of the case, even if now we would not interpret *Taft* and *Markiewicz* to allow the single injury rule to substitute for a showing of individual causation. *See generally, Piner v. Superior Court,* 192 Ariz. 182, 187, ¶ 20, 962 P.2d 909, 914 (1998) (discussing the indivisible injury rule in Arizona after the legislature adopted the Uniform Contribution Among Tortfeasors Act). Under the law of the case doctrine, "if an appellate court has ruled upon a legal question and remanded for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case." *Flores v. Cooper Tire and Rubber Co.,* 218 Ariz. 52, 57, ¶ 23, 178 P.3d 1176, 1181 (App. 2008) (citations omitted). After fourteen years of litigation, application of the doctrine seems particularly appropriate here.

¶ 43 Moreover, even if we held that the Farmers were required to prove individual causation, we would still conclude the trial court effectively required them to do so. During its deliberations at the end of the liability trial, the jury asked the court to clarify whether it could find that the District did not cause any damages to some Farmers. The question read:

> [This case] ... seems to imply that all [Farmers] ... have equally meritorious claims and all will receive the same verdict.

---

18. The trial court interpreted the opinion in the same manner in denying the District's request to

provide individualized jury forms for each Farmer.

How do we handle the situation where we believe the fault verdict might apply to some of the [Farmers] but not to others[.] Is this a consideration in [the] verdict, but all [Farmers] must receive the same judgment? Do we find fault but apply a larger percentage[ ] to Farmers? Do we render the fault verdict and the next damages phase of the trial will determine blame for some [F]armers, but no damages for others ... ?

After a lengthy discussion with counsel, the court answered the question as follows:

The plaintiff "[F]armers" have not presented their evidence on damages. Those are issues for the damages phase of the trial, if you find fault. The [F]armers did not individualize their damages and that is the reason the plaintiffs were named, quote, [F]armers, unquote[.] *If you find that the [District]'s negligence was not a cause of injury to a particular plaintiff, please so indicate that plaintiff—that [F]armer below.*

(Emphasis added.) The Farmers objected to this response, but the District did not because it permitted the jury to single out any Farmer who in its opinion did not prove causation. Despite this opportunity, the jury returned a verdict for the Farmers on the negligence claim and therefore found that the District had caused some damages as to each Farmer. Thus, even if the law of the case was to the contrary, we would not require each Farmer to prove something they all have already established: individual causation.

### b. Substantial Evidence Showing Causation

¶ 44 The District next argues the evidence did not support the jury's determination that the District was a partial cause of the Farmers' damages. Although the District's precise argument on this issue is difficult to ascertain, in essence the District seeks to discredit the Farmers' theory of liability and, more specifically, to attack the credibility of William L. Graf, Ph.D., who testified on behalf of the Farmers. The District's argument, however, fails to give proper weight to our prior decision in *A Tumbling–T Ranches I,* 197 Ariz. at 552, ¶ 22, 5 P.3d at 266. Based on affidavits from two expert witnesses, including that of Dr. Graf, we reversed the trial court's grant of summary judgment in the District's favor because the affidavits created a question of material fact as to whether the District's conduct contributed to the Farmers' damages. While the other expert did not ultimately testify at trial, Dr. Graf testified consistent with his prior affidavit and thus the Farmers presented sufficient evidence to allow a reasonable jury to conclude that increased downstream sedimentation permanently changed the river system, increasing the risk of flooding to the Farmers.[19] *See Warner v. Sw. Desert Images, LLC,* 218 Ariz. 121, 131, ¶ 25, 180 P.3d 986, 996 (App.2008) (finding the standards for granting summary judgment and JMOL are similar: whether the evidence in support of a claim would not allow reasonable people to agree with the conclusions of the claim's proponent). Accordingly, causation was a proper issue for the liability jury's consideration.

### c. Foreseeability

¶ 45 The District further contends the trial court erred by not instructing the jury to decide whether the 1993 flood was unforeseeable, being so unusual in character that the burden of anticipating it would be out of all proportion to the chance that it would occur and the risk of harm if it did occur.

¶ 46 The Gila River has a history of flooding. Major floods include 250,000 f3/s in 1891, 125,000 f3/s in 1978, and 178,000 f3/s in 1980. In this context, the 1993 flood's peak rate of 132,000 f3/s was not unprecedented in terms of magnitude. But the 1993 flood was unusually long in duration, with total runoff volume almost twice as much as preceding floods.

¶ 47 Nonetheless, engineers must predict unusually large floods in designing projects

---

**19.** *See, e.g., supra,* ¶ 6 (detailing system-wide change to the Gila River downstream from the

Gillespie Dam after the 1993 flood).

located within a floodplain. For example, an engineering firm prepared a report for the District in 1981 on proposed changes to the Gillespie Dam as it related to the flood control projects. In its design recommendations, the firm assumed a 200,000 f3/s flood with a predicted frequency of once every 65 years. Measuring the magnitude and probability of flooding in this manner is commonly performed for purposes of civil engineering projects, environmental regulations, and flood insurance. Under Arizona law, flood control districts are required to regulate floodplains, A.R.S. § 48–3609(B) (Supp.2008), and the extent of a floodplain is delineated by a 100–year flood.[20] A.R.S. § 48–3601(9) (Supp.2008). The regulatory power of flood control districts is thus defined by the very event the District argues is unforeseeable—an unusually large flood.

¶ 48 As such, the 1993 flood was foreseeable by a reasonable flood control district and was not otherwise an extraordinary event. *Cf. Markiewicz*, 118 Ariz. at 334, 338–39, 576 P.2d at 522, 526–27 (finding homeowners could prove proximate cause even in the context of a 500–year rainstorm). The flood was not a superseding cause that broke the link between the District's negligence and the resulting injury to the Farmers.[21] *See Patterson v. Thunder Pass, Inc.*, 214 Ariz. 435, 439, ¶ 14, 153 P.3d 1064, 1068 (App.2007) (superseding event is one that is unforeseeable by a reasonable person in the position of the defendant and when looking back after the event, the event must appear extraordinary). The trial court did not err in refusing to instruct the jury on this matter.

### 3. Damages

¶ 49 The District argues the trial court erroneously instructed the jury on the available measure of damages when it allowed it to consider diminished land values.[22]

¶ 50 We review a court's jury instructions for an abuse of discretion. *S. Dev. Co. v. Pima Capital Mgmt. Co.*, 201 Ariz. 10, 23, ¶ 41, 31 P.3d 123, 136 (App.2001). But we review whether a jury instruction correctly states the law de novo. *See Romero v. Sw. Ambulance*, 211 Ariz. 200, 204, ¶ 8, 119 P.3d 467, 471 (App.2005). In deciding this question, we review jury instructions in their totality. *Dawson*, 216 Ariz. at 105, ¶ 63, 163 P.3d at 1055. A party is entitled to an instruction on any theory of the case if reasonably supported by the evidence. *See*

20. A 100–year flood is calculated as the level of floodwater expected to be equaled or exceeded every 100 years on average. A 100–year flood is more accurately referred to as the one percent flood, since it is a flood that has a one percent chance of being equaled or exceeded in any single year. *See* A.R.S. § 48–3601(9) (2008). Based on the expected flood water level, a predicted area of inundation can be mapped. *See* A.R.S. § 48–3601(5), (6) (applying floodplain regulations to lands which have or may be covered by a 100–year flood).

21. Unlike a municipality that constructs a culvert, for example, a flood control district has a more difficult time presenting a persuasive argument that it could not reasonably anticipate unusually heavy rainfall, resulting flooding, and the consequences thereof when constructing flood control projects in the bed of a major river. *Cf. City of Tucson v. Koerber*, 82 Ariz. 347, 351, 313 P.2d 411, 414 (1957) (holding city not liable for flood-related damages where it could not reasonably anticipate increased volume of water discharged by third persons when constructing a culvert).

22. The relevant jury instruction provided:
In this case, [the Farmers] claim that the [District] was at fault. Fault is negligence that was a cause of [the Farmers'] injuries. In this case, a jury has previously found that the [District] was 10 percent at fault. Therefore, you must now, determine the full amount of money that will reasonably and fairly compensate each [Farmer] for the damages proved by the evidence to have resulted from the 1993 flood event. The [trial court] will later reduce those damages by the percentage of fault the previous jury assigned to [the District].
You should consider the following:
1. The reasonable cost of necessary repairs to any property that was damaged;
2. The reasonable value of lost crops;
3. The reasonable value of land lost through erosion, and,
4. If you find that the injury to the property was permanent, the difference between the fair market value of any damaged property immediately before the 1993 flood event and its fair market value immediately thereafter.
An additional instruction further explained:
An injury to property is permanent if the cause of the injury is not abatable and the injury itself has not been, or cannot reasonably be, cured.

*Catchings v. City of Glendale,* 154 Ariz. 420, 423, 743 P.2d 400, 403 (App.1987).

¶ 51 The District first argues the Farmers were not entitled to damages based on diminished land values under a negligence theory, contending that such damages would be appropriate only on the Farmers' claim of inverse eminent domain. We disagree.

¶ 52 Damages based on diminished land values may be, and often are, available under a negligence theory. *See* Douglas A. Blaze & Jefferson L. Lankford, *The Law of Negligence in Arizona* § 5.02[2][i][ii] at 5–13–5–14 (3rd ed. 2007) ("Generally, the measure of damages for injury to land is the difference in fair market value before and after the injury to the property."). Contrary to the District's claim, a party's cause of action is less important than the property interest invaded when determining an appropriate remedy. *See* 1 Dan B. Dobbs, *Law of Remedies* § 5.1, at 710 (2d ed.1993). Thus, diminished land value may be an appropriate measure of damages for a negligence claim. *Id.* at 711.

¶ 53 The District next argues that the Farmers were not entitled to damages based on diminished land values. It contends the Farmers failed to prove their damages were permanent in nature because the increased threat of flooding was based on pure speculation.[23]

¶ 54 An injury to real property may be characterized as permanent or temporary. *City of Tucson v. Transamerica Title Ins. Co. of Ariz.,* 26 Ariz.App. 42, 44, 545 P.2d 1004, 1006 (1976). An injury is temporary if its cause is abatable (or preventable) and repair costs are otherwise reasonable; that is, the costs to repair do not exceed the damaged property's diminished value. *Compare Apache Motors,* 74 Ariz. at 106, 245 P.2d at 260 (finding threat of flooding is a temporary injury, dictating landowners sue for each successive injury, if the injury was originally difficult to foresee and

is unlikely to reoccur except at unpredictable intervals and is otherwise capable of abatement) *with Clausen,* 59 Ariz. at 85–86, 123 P.2d at 177–78 (finding threat of flooding would be a permanent injury, if a jury determined that it was "so menacing and dangerous that it depreciates the value of [the landowner's] property").

¶ 55 Here, the liability jury found the District's negligence caused some damage to the Farmers. Presumably, the jury accepted the theory of causation offered by the Farmers: the District's projects had the effect of increasing the velocity of floodwaters on the Gila River and thereby contributed to downstream sedimentation during the 1993 flood, which in turn increased the threat of flooding in the future by permanently reducing the river's carrying capacity. Thus, the injury-causing condition (the changed nature of the river due to sediment deposits) and the injury (the increased threat of flooding) were both permanent. In support of the Farmers' theory, Dr. Graf opined, "I can tell you that before 1993, for at least a century, major adjustments like the one[s] we [have] seen most recently did not occur, and that after 1993, we have a new situation that is likely to destabilize the river ... for at least a period measured in centuries." Mr. Cotton, an engineer specializing in flood control projects, stated it would take "a human lifespan" for the river to move the sediment released after the dam's failure. This testimony contrasts with the situation when a landowner offers inadequate evidence of a permanent injury-causing condition. *See, e.g., County of Mohave v. Chamberlin,* 78 Ariz. 422, 424–29, 281 P.2d 128, 129–32 (1955) (finding sewage effluent contaminated a water well on only a single occasion, the effluent did not permanently foul the soil, and the city took remedial measures to prevent the effluent from reaching the well in the future).

¶ 56 The District contends that awarding damages based on diminished land values is

---

**23.** In its reply brief on cross-appeal, the District claims that if the Farmers are entitled to damages based on diminished land values, they should receive this measure of damages for the 870 acres actually flooded in 1993 and not the entire acreage owned by the Farmers. Because

the District did not raise this argument in its opening brief on cross-appeal, we do not address it. *See, e.g., Ness v. W. Sec. Life Ins. Co.,* 174 Ariz. 497, 502, 851 P.2d 122, 127 (App.1992) (declining to address an issue raised for the first time in a reply brief).

to speculate as to where, when, and how much damage will occur in the future. But the Farmers presented testimony that they experienced a presently-realized harm: the decreased value of their farmlands, despite the loss being predicated on a future event that was merely contingent. *Cf.* Restatement (Second) of Torts § 929 cmt. a (1979) ("Recovery for depreciation resulting from a past invasion is, in a legal sense, prospective since it is based upon the fact that the land has lost its present value because of harm to its future use.").

¶ 57 Despite testimony to the contrary, the District questions whether the evidence warranted a jury instruction on permanent damages. The District asserts that (1) Dr. Davis used a flawed methodology to reach his conclusions and a general market decline was, in fact, the real cause of decreased land values; (2) because the District's clearing and channelization projects were destroyed during the 1993 flood, the projects no longer caused an injury to the Farmers; and (3) the threat of flooding was abated, at least to a pre–1993 level, through the District's involvement in a multiagency effort to increase the storage capacity of Roosevelt Lake[24] and thereby reduce downstream flooding on the Gila River. We reject these contentions.

¶ 58 As to their injury, the Farmers offered a report concluding they experienced decreased land values after the 1993 flood. Dr. Davis, the expert who prepared the report, testified the increased threat of flooding decreased land values by half. He explained the Gillespie Dam's breach was obvious and a knowledgeable buyer would inquire as to the risk of flooding. Additionally, each of the Farmers testified that their lands were devalued by $1,000 per acre. *See, e.g., Town of Paradise Valley v. Laughlin,* 174 Ariz. 484, 486, 851 P.2d 109, 111 (App.1992) (landowners are competent to testify about property values and an explanation of the method used to make this determination goes to the

weight and not to the admissibility of such testimony). Second, the relevant injury-causing condition was the river's changed nature, a situation the District helped create together with the Dam Owners. The fact that the flood control projects no longer exist is not dispositive. Third, it may well be that expanding the capacity of Roosevelt Lake reduced the threat of flooding along the Gila River as a whole. The Farmers, however, challenged this evidence at trial when Mr. Cotton testified that raising the height of Roosevelt Dam did not reduce the risk of flooding as to the Farmers.

¶ 59 We decline the District's invitation to reweigh the credibility of expert testimony on appeal. *See, e.g., Logerquist v. McVey,* 196 Ariz. 470, 488, ¶ 52, 1 P.3d 113, 131 (2000) (as a question of fact, the jury determines the accuracy, weight, and credibility of testimony). We conclude sufficient evidence supported the court's decision to instruct the jury on diminished land values as a measure of damages.

¶ 60 Even if the harm caused by the District was temporary in nature, we would not find the trial court's instruction to the jury improper. If the cause of injury to property is "abatable or preventable and the injury is capable of rectification by reasonable restoration, the cost of which does not exceed the damage to the property, the injury will be considered temporary[.]" *Transamerica,* 26 Ariz.App. at 44, 545 P.2d at 1006; *see also Graber v. City of Peoria,* 156 Ariz. 553, 557, 753 P.2d 1209, 1213 (App.1988).

¶ 61 If the Farmers had been limited to recovering temporary damages, it is undisputed their abatement costs would have substantially exceeded the diminution in value, or permanent damages. The Farmers disclosed an estimate before the damages trial that abating the increased threat of flooding by building levees would cost $88 million.[25]

---

24. Roosevelt Lake is located on the Salt River, which joins the Gila River above Gillespie Dam. In 1996, a $430 million modification project was completed that raised the height of Roosevelt Dam, expanding the lake's storage capacity by 20%. *www.srpnet.com/water/dams/roosevelt.aspx*

25. An engineer hired by the Farmers, Mr. Zeller, prepared this estimate, which included the cost of building levees and soil cement banks to protect 20 miles of downstream riverbank. Mr. Zeller did not testify because the trial court granted the District's motion in limine to preclude his estimate from being presented to the jury. On appeal, the District argues that it never

This estimate far exceeds the Farmers' claimed damages based on the diminished value of their lands. *See infra* ¶ 95, n. 32. Thus, using diminished land values as a measure of damages not only reflected the true economic loss to the Farmers, but protected the District from paying them a windfall if abatement costs were used. *See generally*, 1 Dobbs, *Law of Remedies* § 5.1–5.2(4), at 710–24 (labeling an injury as either permanent or temporary does not turn exclusively on a description of the injury, but rather, the distinction is a legal term of art that advances the policy goals of avoiding economic waste and windfall gains to landowners by using diminished land value damages as a ceiling on repair costs).

## B. Affirmative Defenses

¶ 62 The District argues the trial court erred in denying the following defenses: (1) sovereign immunity; (2) assumption of risk; (3) non-party at fault; (4) illegal floodplain activities; and (5) state ownership of lands located within the boundaries of a navigable river.

## 1. Sovereign Immunity

¶ 63 Prior to the liability trial, the District sought and was denied summary judgment under A.R.S. §§ 12–820.01 (absolute immunity) and 26–314 (emergency management immunity). The trial court also denied the District's request to instruct the jury on these defenses. Throughout the liability trial, the District maintained it was wrongly denied these defenses and moved for JMOL and a new trial. Both motions were denied. On appeal, the District renews these arguments. As questions of statutory interpretation, we review the District's immunity claims de novo. *Carroll v. Robinson*, 178 Ariz. 453, 456, 874 P.2d 1010, 1013 (App. 1994).

### a. Absolute Immunity

¶ 64 The District contends its decision to construct flood control projects on the Gila River involved the exercise of fundamental governmental policy under A.R.S. § 12–820.01, thereby granting the District absolute immunity for any claims related to the construction of its flood control projects above Gillespie Dam. The statute provides:

A. A public entity shall not be liable for acts and omissions of its employees constituting either of the following:

1. The exercise of a judicial or legislative function.

2. The exercise of an administrative function involving the determination of fundamental governmental policy.

B. The determination of a fundamental governmental policy involves the exercise of discretion and shall include, but is not limited to:

1. A determination of whether to seek or whether to provide the resources necessary for any of the following:

   (a) The purchase of equipment.

   (b) The construction or maintenance of facilities.

   (c) The hiring of personnel.

   (d) The provision of governmental services.

2. A determination of whether and how to spend existing resources, including those allocated for equipment, facilities and personnel.

A.R.S. § 12–820.01.

¶ 65 Our supreme court has recognized that liability of public servants is the rule and immunity is the exception; therefore, courts should construe immunity provisions in statutes narrowly and with restraint. *See Fidelity Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 225, ¶ 7, 954 P.2d 580, 583 (1998). The policy reasons for granting legislative and judicial immunity are much

admitted the costs of abating the threat of flooding would exceed the diminished value of the Farmers' land. We reject this argument, finding that the District's counsel conceded this very point: "If we're talking about building a levee system from both sides of the river, from Gila down to Painted Rock, absolutely way out of

sight. We could stipulate to that without a problem[.]" Thus, the court was not required to accept the $88 million estimate's accuracy to reach the conclusion that any abatement costs would substantially exceed the diminished value of the Farmers' land.

stronger than those for insulating administrative decisions from liability. *Id.* at 225, ¶ 8, 954 P.2d at 583; *see also Schabel v. Deer Valley Unified Sch. Dist. No. 97,* 186 Ariz. 161, 164, 920 P.2d 41, 44 (App.1996) (absolute immunity protects government from almost limitless liability that arises from the extensive power to act for the public good but does so at the cost of inequitable results for individual plaintiffs). In light of these considerations, we examine the District's claim to absolute immunity under A.R.S. § 12–820.01.

¶ 66 The District did not engage in judicial or legislative functions when building its flood control projects; therefore, to qualify for absolute immunity, the District's decision must be characterized as an administrative function involving fundamental governmental policy. *See Kohl v. City of Phoenix,* 215 Ariz. 291, 295, ¶ 15, 160 P.3d 170, 174 (2007). As interpreted by our supreme court, fundamental governmental policy involves the exercise of discretion and, in the appropriate case, the determination of whether to seek or provide the resources necessary for construction of the project in question. *See id.* (citations omitted).

¶ 67 The District argues that deciding whether and how to spend resources is by definition a determination of fundamental governmental policy. But accepting this broad position runs counter to the recognized principle that immunity statutes are to be narrowly construed. *See Schabel,* 186 Ariz. at 164–65, 920 P.2d at 44–45. For this reason, courts have distinguished high-level policymaking decisions, which include promulgating rules and regulations, from operational decisions, which more often involve day-to-day implementation of a regulatory scheme. *See Kohl,* 215 Ariz. at 295–96, ¶ 19–21, 160 P.3d at 174–75. Policymaking decisions are absolutely immune, while operational decisions implementing such policy are not, even where they involve the exercise of some discretion. *Id.* Hence, the relevant inquiry is whether the District's decisions were limited to policymaking decisions or whether they also included operational decisions and exposed the District to tort liability.

¶ 68 We conclude that the District's decision to alleviate flooding to properties located upstream from the Gillespie Dam was undoubtedly a policymaking decision, involving the expenditure of significant funds and also coordination with the governor's office as well as various state and federal agencies. By contrast, the District's implementation of its overall flood-control plan was operational in that it involved the exercise of professional engineering judgment.

¶ 69 The District relies on *Kohl* to assert absolute immunity; however, the facts in *Kohl* differ substantially from this matter. There, the plaintiffs sued the City of Phoenix when their teenage son was killed in an auto accident at an intersection without a traffic signal. 215 Ariz. at 292, ¶ 2, 160 P.3d at 171. The parents alleged the City's negligent failure to install a traffic signal at the intersection caused their son's death. *Id.* The City countered that its decision not to install a signal at the intersection was entitled to absolute immunity under A.R.S. § 12–820.01. *Id.* at ¶ 3. The central issue in the case was whether the City's decision flowed inexorably from the policy-level decision to adopt a computer program to automatically identify dangerous intersections for signalization or, whether the City's decision was an operational failure because the City's staff relied not only on the computer program in question, but also on their engineering judgment. *Id.* at 296, ¶ 22, 160 P.3d at 175. Our supreme court held that the City was entitled to absolute immunity. *Id.* at 298, ¶ 31, 160 P.2d at 177. The court reasoned that the opportunity to use engineering judgment did not arise because the computer program limited the exercise of such judgment to the twenty most dangerous intersections, which excluded the intersection where the teenager was killed, because it was never ranked higher than seventy-first among locations surveyed. *Id.* at 293, 296, ¶¶ 7, 22, 160 P.2d at 172, 175.

¶ 70 Unlike *Kohl,* the District's decisions to clear the tamarisks and to construct a channel in the river did not flow automatically from an immunized policymaking decision, namely, the decision to alleviate flooding upstream from the Gillespie Dam. Rather, the District exercised considerable engineering

judgment by (1) drafting an environmental impact statement that evaluated various potential clearing alignments; (2) determining the project's alignment on the Gila River, which deviated from the Corps of Engineers' recommended width for the clearing project; and (3) drafting blueprints for contractors.

¶ 71 Additionally, the Farmers offered evidence that the District's implementation of the clearing project fell below the standard of care. Dr. Graf testified that had the District cleared vegetation up to the Gillespie Dam, instead of stopping a mile or half-mile before the dam, floodwaters would have poured evenly over the dam's face, reducing the directed force of the clearing project. Dr. Graf concluded that the District's pilot channel in the riverbed further focused the floodwater, increasing its velocity and thus the river's ability to transport sediment. Evidence relating to the District's breach of the standard of care does *not*, by itself, establish that its actions should not be immunized under A.R.S. § 12–820.01. *See Kohl*, 215 Ariz. at 295, ¶ 16, 160 P.3d at 174 (statutory immunity is not abrogated because experts can opine that government entity's conduct was negligent). Nonetheless, such evidence is relevant when it tends to show the exercise of discretion in implementing a policymaking decision, as here.

¶ 72 In sum, the District's design and implementation of its flood control projects involved the exercise of *some* discretion but did not rise to the level of establishing fundamental governmental policy (*e.g.*, the exercise of *significant* discretion, such as an initial determination to build a flood control project) or flow automatically from a policymaking decision and thus involve *no* discretion. *Kohl* does not suggest a different result.

¶ 73 We believe our decision also accords with other cases concluding that once a policymaking decision has been made, its implementation is not entitled to absolute immunity under A.R.S. § 12–820.01. *See, e.g., Doe ex rel. Doe v. State*, 200 Ariz. 174, 177, ¶ 9, 24 P.3d 1269, 1272 (2001) (decision to require teachers to be certified was entitled to absolute immunity while granting a specific certificate to a prior sex offender was not); *Schabel*, 186 Ariz. at 166, 920 P.2d at 46

(decision to provide playground equipment was a policymaking decision but failing to eliminate specific safety hazard was operational); *Galati v. Lake Havasu City*, 186 Ariz. 131, 135–36, 920 P.2d 11, 15–16 (App. 1996) (city liable for negligent design and repair of roadway notwithstanding that these functions involved expenditure of resources and the weighing of alternatives). Accordingly, the trial court properly denied the District's immunity defense under A.R.S. § 12–820.01.

### b. Emergency Management Immunity

¶ 74 In a related argument, the District claims immunity under the Emergency Management Act ("the Act"), A.R.S. §§ 26–301 to 318. Section 26–301(6) (Supp.2008) defines emergency management as "the preparedness, response, recovery and mitigation activities necessary to respond to and recover from disasters, emergencies or contingencies." Section 26–301(12) (Supp.2008) further defines "preparedness" as "actions taken to develop the response capabilities needed for an emergency." Section 26–314(A) (2000) then immunizes emergency management activities:

> This state and its political subdivisions shall not be liable for any claim based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of the state or its political subdivisions or any employee of this state or its political subdivisions, excepting [willful] misconduct, gross negligence or bad faith of any such employee, in carrying out the provisions of this chapter.

The District argues it is entitled to immunity under § 26–314(A) because flood control projects constitute "emergency preparedness."

¶ 75 The language of A.R.S. § 26–314(A) invites an evaluation of the entire statutory scheme. We thus consider factors in addition to the statute's plain language in deciding whether the legislature intended to immunize flood control projects under the Act. *See Wenc v. Sierra Vista Unified Sch. Dist. No. 68*, 210 Ariz. 183, 185, ¶ 6, 108 P.3d 962, 964 (App.2005) ("We focus on the lan-

guage of the relevant provisions, and if that language is subject to different interpretations, we then consider 'other sources of legislative intent such as the statute's context, historical background, consequences, spirit, and purpose.'") (citation omitted). In doing so, we are mindful that construction of immunity provisions should be restrained and narrow. *See Schabel*, 186 Ariz. at 164, 920 P.2d at 44.

¶76 Here, the Act's purpose is directed at granting the governor emergency powers and establishing an agency to plan for and coordinate the state's response to a natural or manmade disaster. *See* 1971 Ariz. Sess. Laws, ch. 51 § 1(A) (1st Reg.Sess.). This stated legislative purpose is confirmed by an examination of the Act. *See, e.g.*, A.R.S. §§ 26–303 (Supp.2008) (defining governor's emergency management powers); 26–304 (2000) (listing membership on emergency council); 26–305 (Supp.2008) (establishing a director of emergency management); 26–307 (2000) (empowering political subdivision to take emergency management measures); 26–310 (2000) (relaxing licensing requirement for out-of-state professionals during an emergency); and 26–312 (2000) (authorizing receipt of federal emergency aid). The Act does address flood control measures in A.R.S. §§ 26–321 to 323, *repealed by* Ariz. Sess. Laws, ch. 287, § 1 (2d Reg.Sess.), but only to authorize limited exchanges of state owned land for the benefit of landowners located within a floodplain. Such a program does not, in our view, contemplate immunizing flood control districts from liability for negligence. *Cf. Sabina v. Yavapai County Flood Control Dist.*, 196 Ariz. 166, 170, ¶18, 993 P.2d 1130, 1134 (App.1999) (flood control district was not entitled to immunity under A.R.S. § 12–820.01 and had a duty to act reasonably in light of foreseeable risks in performing regulatory mandate to restrict dangers to health, safety,

and property due to water or erosion hazards).

¶77 We also note that a separate statutory framework establishes and regulates flood control districts. *See* A.R.S. §§ 48–3601 to 3628 (Supp.2008). It does not contain an immunity provision beyond § 48–3603(A), which only protects districts from having their properties and bonds taxed. Further, during proceedings before the trial court, the District acknowledged that it designed and constructed its projects under the enabling statute for flood control districts, and not, as its immunity argument would suggest, under the Act. The District is not entitled to immunity under A.R.S. § 26–314.

### 2. Assumption of Risk

¶78 The District argues it had the right under the Arizona Constitution to have the jury decide whether the Farmers assumed the risk of flooding by encroaching upon the Gila River floodplain with their farming activities.[26]

¶79 Article 18, Section 5, of the Arizona Constitution provides: "The defense of ... assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury." Despite its broad language, this provision does not guarantee a defendant an unqualified right to raise assumption of risk as a defense. *See, e.g., Gonzales v. Ariz. Pub. Serv. Co.*, 161 Ariz. 84, 90, 775 P.2d 1148, 1154 (App.1989). Instead, to receive this instruction a defendant must present evidence showing: (1) a risk of harm to the plaintiff caused by the defendant's conduct; (2) plaintiff's actual knowledge of the risk and appreciation of its magnitude; and (3) plaintiff's voluntary choice to accept the risk given the circumstances. *See Hildebrand v. Minyard*, 16 Ariz.App. 583, 585, 494 P.2d 1328, 1330 (1972). In *Hildebrand*, this court distinguished contributory negligence from as-

---

**26.** The District proposed the following "assumption of risk" jury instruction:

You must decide whether [the District] has proved that [the Farmers] were at fault because they knew or should have known of the risk that their farmlands in or immediately adjacent to the Gila River riverbed would be

flooded and personal property damaged and/or would be subject to the future flooding, and voluntarily assumed that risk, and, under all the circumstances of this case, whether any such fault should reduce their full damages. These decisions are left to your sole discretion.

sumption of risk, with the latter being very limited in nature, *id.* at 584–85, 494 P.2d at 1330, and noted that the standard applied for assumption of risk is subjective, inquiring as to what the plaintiff actually saw, knew, understood, or appreciated about the risk. *Id.* at 586, 494 P.2d at 1331. This court further recognized that a plaintiff may assume the risk of negligence of another, when fully informed, but a plaintiff is not bound under the doctrine of assumption of risk to anticipate the negligent conduct of others. *Id.*

¶ 80 The District fails to identify how or when it presented evidence justifying an assumption of risk instruction under the *Hildebrand* test. Indeed, the District does not even allege it created a risk of harm for the Farmers or that the Farmers knew of the risks associated with the District's decisions to construct the flood control projects. Nor does the District assert that the Farmers made a voluntary choice to accept the risk of future flooding caused by the District. The District looks only to the pre–1993 risk of flooding rather than the *increased* threat of flooding caused by the District's construction of its flood control projects. Thus, the trial court did not abuse its discretion in refusing to instruct the jury on assumption of risk.

### 3.  Painted Rock Dam

¶ 81 The District makes two arguments relating to the Painted Rock Dam, which is located 37 miles downstream from the Gillespie Dam and is operated by the Corps of Engineers. First, the jury should have been allowed to allocate some fault to the Corps of Engineers because it contributed to the chain of events that resulted in sediment being deposited in the Gila riverbed adjacent to and on the Farmers' land. Second, certain Farmers were not entitled to flood-related damages because they had already sold flowage easements to the Corps of Engineers and, thus, these Farmers should not have been allowed to collect damages for a property right they no longer owned.

### a.  Non–Party at Fault

¶ 82 During the liability trial, the District requested a jury instruction that would have permitted the jury to assign fault to the Corps of Engineers. The District believed doing so was appropriate because the Painted Rock Dam caused sediment to collect in the Gila riverbed that would have otherwise flowed downstream to Yuma, where the Gila River flows into the Colorado River.

¶ 83 A defendant may name a non-party at fault even if the plaintiff is precluded from recovering from the non-party. A.R.S. § 12–2506(B) (2003); *Ocotillo W. Joint Venture v. Superior Court,* 173 Ariz. 486, 488, 844 P.2d 653, 655 (App.1992). As an affirmative defense, however, the defendant must prove that the non-party is actually at fault. *Pfeil v. Smith,* 183 Ariz. 63, 65, 900 P.2d 12, 14 (App.1995). The defendant must, as a result, offer evidence at trial that the non-party was comparatively negligent. A.R.S. § 12–2506(F)(2); *Ocotillo,* 173 Ariz. at 488, 844 P.2d at 655 (defendant must show that the non-party owed a duty to the plaintiff, that the duty was breached, and that the breach caused injury to the plaintiff). A trial court may instruct a jury on assigning fault to a non party only if evidence offered at trial is adequate to support the jury finding that the non-party was negligent. *Czarnecki v. Volkswagen of Am.,* 172 Ariz. 408, 411, 837 P.2d 1143, 1147 (App.1992).

¶ 84 Here, the District has not demonstrated how its burden was met. The District's briefing does not address whether the Corps of Engineers owed a duty of care or if the Corps of Engineers' conduct fell below any applicable standard of care. *Cf.* Mark Siegel & H. Michael Wright, *The Non–Party at Fault Defense: The Squirrel, The Phantom and Everybody Else But Me,* Ariz. Att'y 23, 28 (Jan.1995) ("Often defendants do not provide adequate facts or theory for a non-party at fault defense. This is often true because defendants do not want to characterize a non-party's behavior as tortious where it parallels defendants' own behavior.").

¶ 85 In brief, the District does not argue what evidence, if any, it offered at the liability trial to show that the Corps of Engineers was negligent in its operation of the Painted Rock Dam during the 1993 flood. *See State v. Moody,* 208 Ariz. 424, 452, n. 9, ¶ 101, 94

P.3d 1119, 1147 n. 9 (2004) (failure to develop argument on appeal usually results in abandonment and waiver of issue). Given this fact, we will not review whether the trial court erred when it rejected the District's non-party at fault defense.

### b. Flowage Easements

■ ¶ 86 When the Corps of Engineers constructed the Painted Rock Dam, it purchased flowage easements to overflow, flood, and submerge land located up to an elevation of 667 feet, the extent of the dam's reservoir. Three of the Farmers owned land within the confines of the reservoir and were flooded by ponding floodwaters from the reservoir when it filled to capacity during the 1993 flood. The District contends these Farmers cannot assert a property right they no longer own, i.e., they cannot collect damages from the District for flood-related damages because they sold flowage easements to the Corps of Engineers.[27] Accordingly, the District asserts that the trial court erred by precluding the flowage easements from being used as a defense during the damages trial.

■ ¶ 87 The District's argument confuses the basic legal attributes of an easement with property held in fee simple. An easement is the right of a person to use the real property of another for a specific purpose. See Siler v. Ariz. Dep't of Real Estate, 193 Ariz. 374, 383, ¶ 45, 972 P.2d 1010, 1019 (App.1998) (quotation omitted). It does not, however, alter legal title to property except as to the limited character of the easement. Id. Thus, the owner of land subject to an easement retains the right to recover from third parties for damaging such land, even if the damages result from activities that are similar to those granted in the easement.

¶ 88 In this case, the three Farmers in question sold the Corps of Engineers the right to flood their land with water backing-up from the Painted Rock reservoir. The District does not dispute the Farmers' claim that these easements are appurtenant to their burdened land and the easements are personal to the Corps of Engineers. However, the flowage easements did not give the Corps of Engineers the right to allow third parties, such as the Dam Owners and the District, to flood the Farmers' lands as well. See Restatement (Third) Prop.: Servitudes §§ 4.6(2) (2000) (a servitude benefit, whether appurtenant or in gross, is not transferrable if personal); 4.11 (unless the servitude provides otherwise, the appurtenant easement may not be used for the benefit of property other than the dominant estate).

¶ 89 As discussed previously, the liability jury could have decided the District did not cause "some damage" to the Farmers located within the Painted Rock reservoir. See supra, ¶ 43. Despite this opportunity, the jury found these Farmers suffered damages unrelated to the Painted Rock Dam. From this perspective, the Corps of Engineers' flowage easements are irrelevant to the injuries sustained by the Farmers under their theory of the case.

¶ 90 In sum, the District cannot benefit from the easements three Farmers granted to the Corps of Engineers and the trial court properly granted summary judgment to preclude the District from raising this issue during the damages trial.[28]

### 4. Failure to Obtain Permits

■ ■¶ 91 The District also challenges the trial court's decision to reject its defense that some of the Farmers should have been barred from recovery based on their failure to obtain permits for floodplain activities under federal[29] and local regulations.[30] The

---

27. The District moved for partial summary judgment, seeking to dismiss the three Farmers who sold easements to the Corps prior to the 1993 flood. The trial court denied this motion and granted the Farmers summary judgment on the issue.

28. Because summary judgment was properly granted on the law of easements, we need not address whether the collateral source rule would apply here.

29. The Clean Water Act, 33 U.S.C. §§ 1251 to 1387, establishes a number of permitting requirements. One permit is a § 404 permit, which is required "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (2006). The Corps of Engineers' jurisdiction under § 404 extends only to the "ordinary high water mark" of the "waters of the United States." 33 C.F.R. § 328.3(a); 33 C.F.R. 328.4(c)(1).

District argues that a party engaging in illegal conduct cannot recover damages resulting from such conduct. The District thus contends that the trial court erred in precluding this defense during the damages trial.[31] Because we reject the District's argument on procedural grounds, we turn first to the proceedings in the trial court related to this issue.

¶ 92 During the 2004 liability trial, the District offered Michelle Waltz as an expert witness to testify concerning § 404 of the Clean Water Act. The Farmers objected based on untimely disclosure and because Waltz's testimony would be relevant only during the trial on damages. The Farmers then offered to stipulate that the Gila River constitutes the jurisdictional waters within the United States under § 404. The Farmers did not stipulate, however, that they had violated any permitting requirements. Notwithstanding the Farmers' offer, the District maintained it was still necessary for Waltz to testify. The Farmers agreed she could testify on a limited basis to identify what she believed to be the jurisdictional delineation (ordinary high water mark) of the Gila River.

¶ 93 After further discussion with counsel, the court allowed Waltz to testify but reminded the parties "[they're] not here on the damage issue of the case. [The witness] won't be telling us whether or not any of this property is in or out of the [riverbed.] [.]" Waltz testified that she was hired by the District to determine the ordinary high water mark for the Gila River. She explained that she visited the property and prepared a series of exhibits delineating the water mark for the Gila River. The Farmers objected when the District offered Exhibit 632, which apparently was a map prepared by Waltz showing the water mark as it related to the lands owned by the Farmers. Sustaining the objection, the trial court did not allow Waltz to share her findings with regard to the Farmers' properties.

¶ 94 As part of the District's offer of proof, Waltz briefly explained the meaning of the "red lines" and the "blue lines" included on Exhibit 632. Following the liability trial, Exhibit 632 was released to the District. The exhibit is not in the record on appeal.

¶ 95 Prior to the damages trial, the District filed motions for partial summary judgment against eight of the Farmers. The District argued that these particular Farmers, owning lands within the riverbed as delineated by the ordinary high water mark, were barred from collecting their "direct damages" [32] based on their failure to comply with § 404 and the floodplain regulations. The District provided evidence showing that the eight Farmers had conducted specific activities within the riverbed that would allegedly constitute violations. The District's exhibits purportedly included two documents describing the portions of the Farmers' lands that are subject to the permitting requirements and the related damage claims. We have been unable to locate either document in the record.

¶ 96 The trial court denied the District's motion for summary judgment and granted the Farmers' cross-motion, concluding in part there was an insufficient causal nexus between the alleged illegality and the 1993

30. The District adopted regulations in 1974 that provide authority for delineation of floodplain areas and the regulation of activities and uses occurring within such areas. Article I, § 401(c), 1974 Floodplain Regulations for Unincorporated Areas of Maricopa County. Failure to comply with the floodplain regulations is a Class 2 misdemeanor. A.R.S. § 48–3615(B) (Supp.2008).

31. In addition, the District summarily argues that the court erred in granting summary judgment to the Farmers on this issue prior to the damages trial and also in failing to instruct both juries as to the District's illegality defense. For the reasons stated, we reject those arguments.

32. The District's motions appear to have been directed at precluding the Farmers from recovering damages to improvements on their lands located within the high watermark area of the riverbed, including crops, canals, headgates, turnouts, pumpback systems, embankments, and levees. These damages, based on the actual destruction of land and improvements, were described by Dr. Davis as "direct" damages, in contrast to the damages related to the Farmers' loss of property values based on the risk of future flooding, which were described as "diminished value" damages. As presented by Davis, the upper figure for direct damages for all the Farmers was approximately $2,950,000, while the upper figure for diminished value damages was approximately $8,300,000.

flood. While the motions for summary judgment were still pending, the court also granted the Farmers' motions in limine seeking to prohibit the District from presenting evidence of the Farmers' alleged failure to obtain permits for their farming activities.

¶ 97 At the damages trial, the District made its offer of proof by summarizing the expected testimony of Waltz and another expert witness who would give their opinions about the Farmers' failure to comply with § 404 and the floodplain regulations. The District also relied on a pleading referencing dozens of exhibits, none of which are included in the record on appeal. District's counsel again relied on Exhibit 632, which, as noted, is also not in the record before us. The jury then rendered nine general verdicts awarding different amounts to each of the Farmers. *See supra,* ¶ 12, n. 6.

¶ 98 Based on this procedural posture, we reject the District's request for a new trial on damages based on its illegality defense on two grounds. First, the District has not asserted, in the trial court or on appeal, that the Farmers' failure to obtain permits precludes them from recovering diminished value damages. Instead, the District's argument focuses only on the direct damages (or a portion thereof) claimed by the Farmers. Because the jury rendered a general verdict, we have no way of knowing how the nine damage awards were calculated. The jury may have awarded all, a portion, or none of the Farmers' direct damages because the diminished value damages, even at the lowest estimate given by Dr. Davis, were substantially in excess of the jury's verdict. The District did not request special verdicts that would have allowed the jury to differentiate between direct damages and diminished value damages. *Dunlap v. Jimmy GMC of Tucson, Inc.,* 136 Ariz. 338, 341, 666 P.2d 83, 86 (App.1983) (finding that "[a] request for special verdicts would have been the proper method of assuring that the award of damages was not partly based on a count which had been erroneously submitted to the jury.") Thus, even assuming that the Farmers should have been precluded from claiming some of their damages based on their failure to obtain permits for their activities in violation of federal and local regulations, the Farmers presented sufficient evidence of diminished value damages to support the jury's general verdicts without considering any direct damages. *See Mullin v. Brown,* 210 Ariz. 545, 551, ¶ 24, 115 P.3d 139, 145 (App. 2005) (recognizing that appellate courts will uphold a general verdict if evidence on any one count, issue, or theory is sufficient to sustain the verdict); *Dunlap,* 136 Ariz. at 341, 666 P.2d at 86 (same).

¶ 99 Second, we affirm because the District failed to provide us with an adequate record to review this issue. An offer of proof is "simply a detailed description of what the proposed evidence is." *Jones v. Pak–Mor Mfg. Co.,* 145 Ariz. 121, 129, 700 P.2d 819, 827 (1985) quoting M. Udall & J. Livermore, *Arizona Law of Evidence,* § 13, at 20 (2nd ed.1982). Offers of proof serve a two-fold purpose:

> First, the description puts the trial judge in a better position to determine whether his initial ruling was erroneous and to allow the evidence to be introduced if he decides it was. Second, *the appellate court will be able from the description to determine whether any error was harmful in the context of the case.*

*Id.* (emphasis added). As noted, in this case a number of relevant documents are absent from the record on appeal. "We may only consider the matters in the record before us." *Ashton–Blair v. Merrill,* 187 Ariz. 315, 317, 928 P.2d 1244, 1246 (App.1996). We cannot determine the significance of the documents described in the District's offers of proof and the motions for summary judgment that are absent from the record. It seems logical that the documents advanced by the District, and objected to by the Farmers, supported the District's position that some of the Farmers' damages should have been precluded based on the Farmers' illegal conduct. However, the District has the burden of providing us with all portions of the trial record relevant to this issue. Once a party fails to meet that burden we presume the evidence supports the trial court's ruling. *See id.* ("As to matters not in our record, we presume that the record before the trial court supported its decision.") Thus, having

failed to meet its obligation to provide the necessary record on appeal, we will not address the merits of the District's argument.

¶ 100 We conclude that the trial court did not abuse its discretion in barring the District from raising its illegality defense at the damages trial.

### 5. Lands Located within a Navigable River

#### a. Jurisdiction

¶ 101 The District asserts the trial court erred in preventing it from claiming during the damages trial that the State of Arizona owned at least some of the lands thought to be owned by the Farmers.

¶ 102 To put this issue in proper context, we turn first to the equal footing doctrine and the repeated attempts the Arizona Legislature has made to disclaim any rights that may arise under this doctrine. Title to lands located within a navigable river is vested in the State, which holds such lands in trust for the entire community. *See Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 374, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). Under the equal footing doctrine, lands located below a river's high water mark belong to the State if the river was navigable at the time of statehood. *Ariz. Ctr. For Law in the Pub. Interest v. Hassell*, 172 Ariz. 356, 359, 837 P.2d 158, 161 (App.1991) (citing *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 222–23, 229, 11 L.Ed. 565 (1845) (reasoning the United States held navigable waters in trust for future states, which would accede to sovereignty on an "equal footing" with established states upon entering the Union)). State ownership is not lost through the passage of time or the mistaken payment of property taxes. *Phillips*

*Petroleum Co. v. Mississippi*, 484 U.S. 469, 484, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988).

¶ 103 In Arizona, the State's potential claim to lands located within its riverbeds, other than the Colorado River, laid largely dormant for 73 years. But in 1985, State officials began asserting claims based on the equal footing doctrine. *Hassell*, 172 Ariz. at 360, 837 P.2d at 162. Two years later, the Arizona Legislature sought to relinquish most of these claims, finding they disrupted long-held assumptions regarding property ownership throughout the state. *Id.* In 1991, however, this court held that disposing of these claims without a "particularized assessment," for little or no compensation, was unconstitutional under the gift clause and the public trust doctrine. *Id.* at 371, 837 P.2d at 173. In response to *Hassell*, the legislature created the Arizona Navigable Stream Adjudication Commission in 1992 to "investigate and adjudicate" the navigability of the state's rivers and "issue a 'final administrative determination.'" *Defenders of Wildlife v. Hull*, 199 Ariz. 411, 416, ¶ 5, 18 P.3d 722, 727 (App.2001). To further the systematic adjudication of potential claims in an administrative framework, the legislation establishing the Commission also divested courts of subject matter jurisdiction of questions of navigability.[33] In 1994, the Commission's role was limited to fact-finding and was subjected to restrictive evidentiary standards in making recommendations as to whether a river was navigable at the time of statehood. *Id.* at ¶ 6. In 1998, the Commission issued its recommendation, concluding that many of the state's rivers were not navigable. *Id.* at ¶ 7. Adopting these findings, the legislature relinquished most of the State's claims, including those situated along the Gila River. *See* A.R.S. §§ 37–1129.01 to 1129.16 (Supp. 2000), *repealed by* 2001 Ariz. Sess. Laws, ch.

---

**33.** Ariz.Rev.Stat. § 37–1123(G) (2003) originally divested courts of jurisdiction to adjudicate ownership of land potentially located within a navigable river unless the legislature made a determination as to a river's navigability. 1994 Ariz. Sess. Laws ch. 277, § 4 (2d Reg.Sess.). In 2001, the statute was amended to reflect that the Commission was now responsible for making this determination. 2001 Ariz. Sess. Laws, ch. 166, § 6 (1st Reg.Sess.). The statute now provides in relevant part:

No judicial action seeking a determination of navigability of a watercourse, to establish or obtain ownership of land within the bed and banks of a watercourse or to determine any public trust values associated with a watercourse may be commenced, continued or completed unless the commission has made a final determination with respect to the watercourse pursuant to [A.R.S.] § 37–1128.

A.R.S § 37–1123 (2003).

166, § 2 (1st Reg.Sess.). This court, however, invalidated the legislature's second attempt to dispose of the State's claims because federal law preempted the restrictive evidentiary standards the Commission was required to use. *Defenders of Wildlife*, 199 Ariz. at 426, ¶ 58, 18 P.3d at 737 (holding the standards conflicted with the test established in *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870)). This court also found that relinquishment of the State's claims was unconstitutional under Arizona law because it did not comply with the need for a "particularized assessment," as required by *Hassell. Id.* at 427, ¶ 63, 18 P.3d at 738. Thereafter, the legislature revised the statutory scheme, placing responsibility once again on the Commission for making final determinations of navigability and revising the standards used to conform to federal law. *See* 2001 Ariz. Sess. Laws, ch. 166, § 1 (1st Reg.Sess.).

¶ 104 During the damages trial in this case, the Farmers moved for JMOL on the District's defense relating to the State's equal footing claims. The Farmers argued that the court did not have jurisdiction to determine the river's navigability under A.R.S. § 37–1123(G) and the court granted the Farmers' motion. On appeal, the District argues that the court erred as a matter of law in making this decision. Specifically, the District argues its right to raise state ownership as a defense "vested" in 1995, when the Farmers commenced their lawsuit, because "the legislature made its navigability determination on the Gila."

¶ 105 The District's argument is flawed because it ignores that A.R.S. § 37–1123 divested Arizona's courts of jurisdiction to adjudicate this issue in 1992, three years before the Farmers filed suit. *See* 1992 Ariz. Sess. Laws, ch. 297, § 3 (2d Reg.Sess.); *see also* 1994 Ariz. Sess. Laws, ch. 277, § 4 (2d Reg. Sess.). As such, the District did not have a "vested" right to assert this defense as it was unavailable from the very beginning. In 1999, the legislature did determine that the Gila River was not navigable at the time of statehood. *See* A.R.S. § 37–1129.09, *re-pealed by* 2001 Ariz. Sess. Laws, ch. 166, § 2 (1st Reg.Sess.). But this determination does not advance the District's argument. If the determination had withstood judicial scrutiny, the District would have been barred from asserting state ownership. The 1999 legislation, however, was invalid. And thus the legislature never made a determination that would otherwise permit the trial court to adjudicate issues relating to a river's navigability, or lack thereof. In short, it was not error to grant the Farmers' motion for JMOL.

### b. Constitutional Challenge

¶ 106 Lastly, the District asserts in passing that even if A.R.S. § 37–1123(G) properly divested the trial court of jurisdiction, the statute imposes an indefinite and unconstitutional moratorium on the District's right to assert state ownership as a defense. The District notes that the moratorium has been in effect since 1994 and the Commission's history is "rocky," making it possible that a final determination might never be made.

¶ 107 This issue is moot. We take judicial notice that on January 27, 2009, the Commission made its final report on the Gila River, concluding it was not navigable at the time of statehood.[34] Although the Commission's report is subject to appeal, the relevant fact is that the Commission has issued a final report. We therefore decline to address this issue further.

### CONCLUSION

¶ 108 For the foregoing reasons, we conclude that the Farmers were not entitled to JMOL on their inverse eminent domain claim against the District. We also find that the Farmers proved their prima facie negligence claim and that the trial court properly precluded the District from asserting various defenses. We affirm the judgment of the trial court. As the Farmers did not prevail on their appeal, and the District did not

---

**34.** Arizona Navigable Stream Adjudication Commission, Report, Finding and Determination Regarding the Navigability of the Gila River from the New Mexico Border to the Confluence with the Colorado River, 88 (2009), see *www. azstreambeds.com.*

prevail on its cross-appeal, we decline to award costs to either party.

CONCURRING: DANIEL A. BARKER and MARGARET H. DOWNIE, Judges.